UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

ANDREW McEACHIN,

                    Plaintiff,

      -against-

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                 Defendant.

---------------------------------------------------------------- x

MEMORANDUM & ORDER

08-CV-0013 (ENV)(RER)

**VITALIANO, D.J.**

Plaintiff Andrew McEachin seeks review, pursuant to 42 U.S.C. § 405(g), of the final

decision of the Commissioner of Social Security (the "Commissioner") denying his application

for disability insurance benefits under the Social Security Act (the "Act"). The parties have filed

cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

McEachin argues that substantial evidence supports a finding of disability and asks the Court to

remand solely for the purpose of calculating benefits. The Commissioner argues that he properly

concluded that McEachin is not disabled within the meaning of the Act, having correctly applied

the relevant regulations and legal standards. For the reasons set forth below, the Court grants the

Commissioner's motion, denies McEachin's motion, and affirms the decision of the

Administrative Law Judge ("ALJ").

**BACKGROUND**

**A.    Procedural History**

On June 28, 2004, Andrew McEachin filed an application for disability insurance

benefits, alleging a disability onset date of July 22, 2003. The Social Security Administration

("SSA") denied the application on November 17, 2004. On November 12, 2005, McEachin filed

1

an untimely[1] request for a hearing, which was nonetheless granted because ALJ David Z. Nisnewitz found good cause for McEachin's delay. The hearing took place on April 2, 2007 in Jamaica, Queens, New York. McEachin, who was and remains represented by counsel, appeared and testified, as did Louis J. Lombardi, a medical expert, and Pat Green, a vocational expert.

In a May 24, 2007 written decision,[2] the ALJ denied the claim, concluding that McEachin was not disabled within the meaning of the Act from July 22, 2003 through the date of the decision.[3] The decision of the ALJ became the final decision of the Commissioner on October 30, 2007, when the Appeals Counsel denied McEachin's request for review. McEachin timely filed this action on January 2, 2008.

**B.  Personal History**

McEachin alleged that he became disabled on July 22, 2003, the date on which he claims that he suffered injuries to his back "while lifting heavy cases of bottled beverages" at his workplace.[4] (Administrative Transcript ("Tr.") at 17.) More specifically, McEachin claims that he became unable to work on that day due to a lumbosacral joint ligament sprain and disc displacement. (See, e.g., Tr. at 40-41.) Since McEachin met the insured status requirements of the Act only through December 31, 2007, he was eligible for disability insurance benefits only from July 22, 2003 through December 31, 2007. (Tr. at 17.) At the time of the ALJ's decision, plaintiff was 48 years old with a general equivalency diploma ("GED"), (Tr. at 303), and past relevant work experience as an inventory clerk; a darkroom technician; a copy technician; an assistant supervisor; a residential aide; a deli clerk; a mill supervisor; and a

---

[1] See 20 C.F.R. 404.929 et seq.
[2] The decision is erroneously dated June 24, 2007. (Cf. Tr. at 4, 12-14.)
[3] At the administrative hearing, the ALJ clarified that the period at issue was really July 22, 2003 to May of 2006. (Tr. at 317.) As will become clear infra, this discrepancy had no bearing on the determination below, nor does it have any bearing on the Court's decision now.
[4] McEachin was working as an inventory clerk at the time. (See Tr. at 311.)

warehouseman/warehouse supervisor. (Tr. at 22, 41-42, 58, 76, 306-311.)

At his administrative hearing, McEachin testified that, from July 22, 2003 to May of 2006, (see Tr. at 317), he would spend his days doing exercises advised by his doctors and his physical therapist; performing housework (cleaning, mopping, sweeping, doing the laundry, cooking); and doing "a little bit" of the household shopping. (Tr. at 324-25; see also id. at 86, 88.) He testified that he could walk only three to four blocks at a time, although, in 2004, he had reported that he could walk ten city blocks before needing to rest. (Tr. at 91, 325.) He testified that he could sit for 30 minutes at a time, and, in the course of a day, sit for up to four or four-and-a-half hours only. (Tr. at 325-26. But see Tr. at 89-90.) He testified that he would have to lie in bed twice a day for about an hour. (Tr. at 326.) McEachin further testified that he could probably lift about five pounds (perhaps even five to ten pounds) and carry it across a room during this time period. (See Tr. at 327.) Additionally, he claimed that he could not perform his hobbies because they involved physical activity, although he was able to—and did—go out to dinner and take walks in the park, (see Tr. at 328); play cards on the weekends; attend church three to four times a week; and go to the movies every weekend. (See Tr. at 89-90.)

## C.    Medical Evidence

1.    Treating Physicians

Dr. Elie Sarkis, an orthopedic surgeon, treated McEachin after his injury. His first examination was on July 24, 2003. (Tr. at 173-74, 184.) Plaintiff complained of lower back pain, difficulty ambulating, and inability to lift anything. (Tr. at 173.) Dr. Sarkis stated, in a workers' compensation report, that McEachin's lumbar spine listed to the left. (Tr. at 174.) Lateral bending to the left provided some relief; lateral bending to the right was painful and, consequently, restricted. (Tr. at 174.) McEachin was able to stand without difficulty. (Tr. at

3

174.) Straight-leg raising was positive at 45 degrees on the right and negative on the left, and, although McEachin had tenderness in the right sacroiliac region, he experienced none in the sacrosciatic notch. (Tr. at 174.) McEachin's reflexes were equal, and he had no motor or sensory loss. (Tr. at 174.) Dr. Sarkis's tentative diagnosis was lumbosacral spine strain and "rule out [a] herniated lumbar disc." (Tr. at 174.) Dr. Sarkis prescribed Motrin and Tylenol #3, (Tr. at 174), and noted that "[a]t the present time the patient is disabled." (Tr. at 174.) In another workers' compensation form, Dr. Sarkis stated that McEachin was totally disabled from his regular work. (Tr. at 184, 218.)

Plaintiff met with Dr. Sarkis again on July 28, 2003. Although x-rays of his spine showed no pathology, (see Tr. at 175), McEachin had trouble bending over and complained of lower back pain. (Tr. at 175.) Medication provided some relief, (Tr. at 175); Dr. Sarkis prescribed physical therapy. (Tr. at 175.) On that date, as well as after an August 4, 2003 visit, Dr. Sarkis reported, in workers' compensation forms, that McEachin was totally disabled. (See Tr. at 175, 185, 218.)

The August 8, 2003 MRI confirmed that McEachin had a right paracentral herniation at L2-3, creating a ventral extradural defect, and a left foraminal herniation at L4-5, creating impingement there. (Tr. at 138, 229, 258.) Six days after the MRI, plaintiff saw Dr. Sarkis again, (Tr. at 176), at which point he was able to flex to knee level, although lateral bending and extension caused pain. (Tr. at 176.) Straight-leg raising results were the same as on July 24, 2003, as were reflexes. (Tr. at 176.) Dr. Sarkis observed again that there was no sensory or motor loss. (Tr. at 176.) Dr. Sarkis continued McEachin on the same medications and noted that physical therapy had not started yet. (Tr. at 176.) Dr. Sarkis preserved an August 14, 2003 note that McEachin might have a workers' compensation case, (Tr. at 176), and reaffirmed on a

4

workers' compensation form that McEachin was totally disabled. (Tr. at 218.)

Plaintiff's next visits to Dr. Sarkis were on August 14, 2003 and on August 28, 2003, (Tr. at 140, 218), when he complained of pain in his lower back. (Tr. at 140.) His right lateral bends at that time were restricted, due to pain, but left lateral bends provided some relief. (Tr. at 140.) The straight-leg raising test was positive at 45 degrees and to 65 degrees on the left. (Tr. at 140.) McEachin was experiencing tenderness in the lumbosacral region and in the right buttock. (Tr. at 140.) Reflexes were equal bilaterally. (Tr. at 140.) Dr. Sarkis referred McEachin to a neurologist, continued him on the same medication regimen, and advised him to continue on physical therapy. (Tr. at 140.) Once again, Dr. Sarkis stated, in a workers' compensation form, that plaintiff was totally disabled. (Tr. at 218.)

McEachin began seeing a neurologist, Dr. Michael Tugetman, on September 4, 2003. (Tr. at 144-49, 268.) He complained of lower back pain—stabbing pain, most of the time—that occurred even when he was lying down. (Tr. at 144.) He also experienced severe pain when sitting for a long period of time or walking. (Tr. at 144.) McEachin reported tenderness over the lumbar paraspinal muscles at L2-L3 and L4-L5 and described lumbar paraspinal muscle spasm at L4-L5. (Tr. at 145.) When he flexed his back, McEachin complained of acute pain, which radiated bilaterally to the buttocks. (Tr. at 145.) His sacroiliac joint (bilaterally) and quadrates lumborum muscles were palpably tender. (Tr. at 145.) McEachin demonstrated a decreased range of motion on flexion, extention, lateral rotation bilaterally, and lateral bending bilaterally, although his muscle tone and strength, and his neurological examination, were normal. (Tr. at 145-46.) Like Dr. Sarkis, Dr. Tugetman found no reflexive or sensory problems. (Tr. at 145-46.) Dr. Tugetman diagnosed McEachin's condition as lumbar spine sprain with L4-5 impingement. (Tr. at 146.) Again, as Dr. Sarkis had, Dr. Tugetman advised physical therapy, as

5

well as Motrin and Tylenol. (Tr. at 146.) Dr. Tugetman indicated both that McEachin was temporarily disabled for two weeks, (Tr. at 146), and that he was totally disabled. (Tr. at 223, 268.)

McEachin's next visit was to Dr. Sarkis, whom he saw on September 11, 2003, (Tr. at 133), when he complained of lower back pain, primarily in his right buttock. (Tr. at 133.) Straight-leg raising was positive at 45 degrees on the right and 65 degrees on the left. (Tr. at 133.) McEachin experienced tenderness in the lumbosacral region and the right buttock. (Tr. at 133.) He had a limited ability to flex. (Tr. at 133.) Dr. Sarkis found plaintiff's reflexes equal bilaterally and noted that McEachin had not experienced motor or sensory loss. (Tr. at 133.) Dr. Sarkis kept McEachin on the same medication, (Tr. at 133), and indicated once more that McEachin could not work. (Tr. at 187.)

Plaintiff also went back to Dr. Tugetman on September 19, 2003, October 21, 2003, November 10, 2003, and December 8, 2003. (See, e.g., Tr. at 148-49, 164-66, 178-79, 194, 206-08.) McEachin complained of lower back pain with stiffness. (Tr. at 148, 164, 180.) On these occasions, plaintiff complained of pain shooting down his right leg, (Tr. at 166); that he was unable to lift heavy objects; and that he had trouble bending, walking, standing, riding, sitting for extended periods, and rising after sitting. (Tr. at 148, 164, 178.) McEachin experienced a decreased range of motion with pain at extremes of flexion, extension, bilateral rotation, and lateral flexion bilaterally. (Tr. at 166, 178, 180.) Following each of the visits, Dr. Tugetman diagnosed lumbar spine sprain with discogenic disease. (Tr. At 149, 165, 167, 179, 210.) He recommended that McEachin continue with physical therapy, and that, in addition to Motrin and Tylenol, he be given a new prescription for Vicoprofen. (Tr. at 165, 167.) Dr. Tugetman stated, in workers' compensation forms, that McEachin was disabled from work due, inter alia, to

lumbar sprain. (See, e.g., Tr. at 194-96, 199, 201, 205, 208, 211, 217, 268.)

McEachin saw Dr. Sarkis again on October 13, 2003, October 30, 2003, November 18, 2003, and December 23, 2003, (Tr. at 134-36, 243), complaining of pain in his lower back radiating down to his right buttock and thigh. (See Tr. at 134-36.) In December of 2003, he complained of pain radiating down both thighs. (Tr. at 243.) During each visit, he was able to flex to the level above the knees; he noted pain during lateral bending and extension. Straight-leg raising was positive bilaterally. (See, e.g., Tr. at 243.) His lumbosacral and right sacrosciatic notch were tender. (Tr. at 134, 243.) Dr. Sarkis reported that McEachin got some relief when wearing a lumbosacral spine support, (Tr. at 135), that his reflexes were equal bilaterally, that there remained no sensory or motor loss, and that he should be continued on medication (Motrin, Tylenol, and Vioxx) with physical therapy. (Tr. 134-36, 243.) On workers' compensation forms, Dr. Sarkis again indicated that McEachin could not work. (See, e.g., Tr. at 198, 213, 216, 218-19.)

Plaintiff saw Dr. Tugetman again on January 8, 2004. (Tr. at 141.) McEachin complained of lower back pain and shooting pain down his right leg. (Tr. at 141.) He was unable to lift heavy objects, suffered from insomnia and an inability to find a comfortable sleep position, and had difficulty with prolonged riding in an automobile; standing; walking; bending; and rising after sitting. (Tr. at 141.) Range of motion in his lumbar spine was decreased with pain at extremes of motion (flexion, extension, rotation, and lateral flexion bilaterally). (Tr. at 141.) Dr. Tugetman diagnosed lumbar spine sprain with discogenic disease and disc herniations at L2-3 and L4-5. (Tr. at 124, 142.) He advised McEachin to continue with physical therapy and to take Motrin and Vicoprofen. (Tr. at 124, 142.) In workers' compensation forms, Dr. Tugetman indicated that McEachin was totally disabled from regular work. (Tr. at 122, 223-24.)

7

McEachin had follow-up visits with Dr. Sarkis on January 22,[5] February 24, March 9, April 6, May 18, June 1, July 20, and August 10, 2004. (Tr. at 137, 157, 161, 171, 213, 216, 253-56.) He had continuing complaints of pain in his lower back radiating down his extremities. (Tr. at 137, 157, 161, 253-56.) McEachin was still able to flex to the level of his knees, although he complained of pain during lateral bending and extension. (Tr. at 137, 157, 161, 253-56.) Straight-leg-raising was, as before, positive bilaterally. (Tr. at 137, 157, 161, 171, 253-56.) His lumbosacral region and right buttock were tender, as was the sacriosciatic notch on occasion. (Tr. 137, 157, 161, 171, 253-56.) Unchanged too were his reflexes, which were equal bilaterally, and there was a continued absence of motor or sensory loss. (Tr. 137, 157, 161, 171, 253-56.) Dr. Sarkis continued McEachin on the same medications. (Tr. 137, 157, 161, 171, 253-56.) In workers' compensation forms, Dr. Sarkis stated that McEachin was totally disabled and could not work due to lumbosacral sprain, displaced disc, and pain. (Tr. at 37-39, 198, 213, 216, 221, 230, 262-63, 265, 294-95.) When Dr. Sarkis examined McEachin in January of 2004, he diagnosed McEachin with lumbosacral (joint) (ligament) sprain, displacement of invertebral disc, and pain in joint involving pelvic region and thigh. (Tr. at 38-39.) Indeed, as late as April 26, 2005, Dr. Sarkis reported, in a workers' compensation form, that McEachin was totally disabled. (Tr. at 39, 294.)

2.    Physical Therapy

McEachin had started physical therapy by August 2003 and continued it at least through September of 2004. (See, e.g., Tr. at 152, 188-93, 197, 269-74; cf. id. at 140.) During this course of therapy, he received hot packs, a lumbar support, electronic muscle stimulation, and instructions for a home exercise regimen. (See, e.g., Tr. at 152, 182, 202, 244, 246-51; see also

---

[5] Although Dr. Sarkis's summary of the visit is dated January 22, 2004, (Tr. at 254), a workers' compensation form indicates that the visit may have been on January 18, 2004 instead. (Tr. at 37-38, 295.)

id. at 266.)

The record shows that, between September 18, 2003 and January 31, 2004, McEachin saw a Dr. Abraham Lock, who reported, in a series of workers' compensation forms, that McEachin had lumbar sprain and was totally disabled.[6] (See Tr. at 188-93, 197.) During this period, Dr. Lock provided McEachin with physical therapy (Tr. at 188-93, 197) and with "therapeutic procedure/activities." (Tr. at 188-91.)

Plaintiff began working with physical therapist Julius Varricchio on August 16, 2004. (Tr. at 269.) After a September 3, 2004 examination, Varricchio noted, on September 21, 2004, that McEachin had "severe low back pain." (Tr. at 269.) He reported that McEachin did not suffer atrophy, hypertrophy, or dystrophy. Indeed, Varricchio noted that plaintiff had normal muscle strength. (Tr. at 270.) Muscle tone was normal as well, (Tr. at 271); McEachin was observed to walk without help and to suffer no significant gait abnormality. (Tr. at 271.) McEachin was able to toe and toe walk, but could not heel and heel walk, nor could he rise from a squat. (Tr. at 271.) Varricchio indicated that plaintiff could sit for fewer than six hours at a time, stand and/or walk for fewer than two hours, and that he had limited abilities to lift, carry, push and/or pull due to pain. (Tr. at 273-274.) He could offer no clinical correlations to support a claim that McEachin would be unable to perform at least light activities. (Tr. at 285.)

3.     Consulting Physicians

Dr. James Ligouri, a neurologist, examined McEachin in connection with his workers' compensation claim on September 8, 2003. (Tr. 125-26, 235-36.) Dr. Ligouri believed that McEachin had lumbosacral radiculopathy and advised McEachin that he should continue physical therapy. (Tr. at 126, 236.) McEachin's motor exam was 5/5 throughout, although he

---

[6] McEachin also saw Dr. Lock on September 18, 2003 for "Medical Supply." (Tr. at 201, 266.) Again, Dr. Lock indicated, in a workers' compensation form, that McEachin was totally disabled.

experienced some lumbar muscle spasm. (Tr. at 126.) Straight leg raising was to 40 or 50 degrees on the right. (Tr. at 126.) McEachin was able to tandem walk. (Tr. at 126.) After a March 31, 2004 visit, Dr. Ligouri once more diagnosed McEachin with lumbosacral radiculopathy but stated, in a report to workers' compensation, that McEachin was not disabled from regular duties or work, (Tr. at 132, 215, 234), which, upon receiving the results of EMG and nerve conduction testing on August 2, 2004, was a conclusion he restated. (Tr. at 127; see also 128-31.)

Dr. Frank Hudak also examined McEachin for workers' compensation purposes on February 3, 2004. (Tr. at 226-28.) During the visit, McEachin complained of lower back pain, which grew worse when sitting or lying down, difficulty sleeping, occasional numbness in his right buttock (which extended down his leg), and pain radiating into both thighs. (Tr. at 227.) As the ALJ summarized,

> The claimant was able to stand fully erect and forward flex 60 degrees at the waist. Tilting to the right and left 30 degrees was accompanied by pain to the right side of the lower back. There was good motor power in both lower extremities with no pain noted on motor power testing. The straight left raising test was negative bilaterally in the upright position, accompanied by pain. Dr. Hudak recommended continued physical therapy three times a week for six more weeks, and he opined that the claimant was able to return to restricted work activity with no lifting greater than 15 pounds and no repetitive bending at the waist.

(Tr. at 19.)

Plaintiff went to see Dr. Cornacchia, a neurosurgeon, on April 30, 2004, (Tr. at 156), who reviewed McEachin's August 2003 MRI and found from it that McEachin had no radicular pain. (Tr. at 156.) Dr. Cornacchia diagnosed "diffuse" degenerative disc disease at L4-L5, with a milder degree of disease at levels above and below, which he reported could be the cause of his pain. (Tr. at 156.) Dr. Cornaccia did not believe that McEachin was a good candidate for

10

surgery (Tr. at 156); he recommended that plaintiff follow up with his primary care physician and that he manage the condition with physical therapy. (Tr. at 156.)

Finally, Dr. Kyung Seo examined McEachin on behalf of SSA on October 7, 2004. (Tr. at 276-77.) Observing, inter alia, that McEachin could walk normally and had no trouble standing from a seated position, Dr. Seo diagnosed McEachin's abilities to sit, stand, bend, and lift and carry heavy objects as limited due to chronic muscle strain. (Tr. at 19, 277.)

At the administrative hearing, Dr. Louis Lombardi, who had not examined McEachin, testified that, notwithstanding the EMG study's indication that McEachin had L3 radiculopathy, none of the physical examinations supported this diagnosis. (Tr. at 337-38.) Dr. Lombardi testified additionally that McEachin could lift and carry up to 15 pounds; sit for about six hours during an eight-hour workday, with breaks; and stand and/or walk for up to six hours in an eight-hour workday, with breaks. (Tr. at 336.)

**D.    Vocational Evidence**

Proof of McEachin's vocational experience came through the testimony of Pat Green, who noted that plaintiff's past relevant work all involved light to medium exertion. (Tr. at 338-39.) She added that he possessed transferable skills in the areas of, inter alia, information organization and gathering; problem identification; product inspection; operations monitoring; and equipment selection. (Tr. at 340.) She testified that, with these transferable skills, an individual like plaintiff would be able to perform sedentary work as a referral and information aide; as an information clerk; and as a reconsignment clerk. (Tr. at 340-41.)

Even before Green's testimony, the results of a November 16, 2004 Physical Residual Functional Capacity Assessment showed that, while McEachin had exertional limitations, his exertional limitations were in keeping with an ability to perform sedentary work. (See Tr. at

281-86.)

## DISCUSSION

### A.    Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the

Commissioner and affirm, reverse, or modify that decision, "with or without remanding . . . for a

rehearing." 42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004) ("Butts

I"). However, this power of review is not unbounded. When evaluating a determination by the

Commissioner to deny a claimant disability benefits, the Court may reverse the decision only if it

is based upon legal error or if the factual findings are not supported by substantial evidence.

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel,

150 F.3d 177, 181 (2d Cir. 1998)). As courts have explained, "[s]ubstantial evidence 'means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Courts are advised to "keep[] in mind that it is up to the agency, and not [the] court, to

weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118

(2d Cir. 1998). When evaluating the evidence, "the court may not substitute its own judgment

for that of the [Commissioner], even if it might justifiably have reached a different result upon a

de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).

### B.    Standards for Entitlement to Benefits

To be eligible for disability benefits, a claimant must establish that he was disabled

within the meaning of the Act prior to the expiration of his insured status. 42 U.S.C. §§

423(a)(1)(A), 423(c). The SSA has promulgated a five-step sequential analysis that an ALJ must

use to determine whether a claimant qualifies as disabled. See, e.g., Rosa v. Callahan, 168 F.3d

72, 77 (2d Cir. 1999). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the ALJ must determine whether the claimant has a "severe" impairment that limits his work-related activities. 20 C.F.R. § 404.1520(a)(4)(ii). Third, if such an impairment exists, the ALJ evaluates whether the impairment meets or equals the criteria of an impairment identified in the Commissioner's appendix of listed impairments. 20 C.F.R. § 404.1520(a)(4)(iii). Fourth, if the impairment does not meet or equal a listed impairment, the ALJ must resolve whether the claimant has the residual functional capacity to perform his past relevant work.[7] 20 C.F.R. § 404.1520(a)(4)(iv). This step requires that the ALJ first make an assessment of the claimant's residual functional capacity generally. 20 C.F.R. § 404.1520(e); id. § 404.1545. Fifth, if the claimant cannot perform his past work, the ALJ determines whether there is other work that the claimant could perform. 20 C.F.R. § 404.1520(a)(4)(v). In making his determination by this process, the Commissioner must consider four factors: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

The claimant bears the burden of proof as to the first four steps. See, e.g., Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998). If the claimant proves that his impairment prevents him from performing past relevant work, the burden shifts to the Commissioner at the final step. Id.

**C.     The ALJ's Decision**

---

[7] Under the regulations, "past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." See 20 C.F.R. § 404.1565(a).

As an initial matter, the ALJ found that McEachin had met the insured status requirements of sections 216(i) and 223(d) of the Act through December 31, 2007. In step one of the sequential analysis, the ALJ found that McEachin had established that he had not engaged in substantial gainful activity since July 22, 2003, the date of his injury. (Tr. at 17.) The ALJ then moved on to step two, for which he found that plaintiff did have a severe impairment, specifically, lumbosacral sprain and intervertebral disc displacement without myelopathy. (Tr. at 17.) Having found a severe impairment, the ALJ evaluated, third, whether McEachin's impairment met or equaled the criteria of an impairment identified in the Commissioner's appendix of listed impairments; he found that it did not. (Tr. at 17.) To the contrary, he found that McEachin did not have an impairment, or combination of impairments, that met or medically equaled one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. at 17.) More specifically, the ALJ found that the criteria in listing 1.04 Disorders of the spine were not met. (Tr. at 17.) As the ALJ wrote in his decision, "[t]here has been no motor or sensory loss according to [McEachin's] treating physician . . . nor is there evidence of pseudoclaudication of the spine or spinal arachnoiditis." (Tr. at 17.) The ALJ then found that McEachin had the residual functional capacity to perform sedentary work (which the ALJ described as "sitting for a total of six hours in an eight-hour [workday], standing/walking for a total of two hours, lifting 5 pounds frequently and up to ten pounds occasionally"). (Tr. at 17.) Because of McEachin's restricted residual functional capacity, the ALJ, in step four, found that McEachin was unable to perform any of his past relevant work, (Tr. at 19-20), but determined, in step five, that there were a significant number of jobs that existed in the national economy that McEachin could perform instead. (Tr. at 20.) Accordingly, the ALJ determined that McEachin had not been under a disability and denied an award of disability insurance benefits. (Tr. at 21.)

14

**D.    No Reversal of the ALJ's Decision Is Warranted**

The ALJ's finding that McEachin had met his burden of proving that his impairment prevents him from performing his past work is supported by substantial evidence, and, further, because the Commissioner does not appeal from that finding, the lone challenge on appeal is to the ALJ's determination at step five, specifically, that there are significant numbers of jobs in the national economy that plaintiff is capable of performing.  To address this challenge, the Court focuses on (1) the ALJ's assessment of McEachin's residual functional capacity and (2) step five of the ALJ's analysis.

1.    Residual Functional Capacity

The residual functional capacity is the assessment of the maximum level of activities a claimant can still perform despite the physical and mental limitations that affect what the claimant can do in a work setting.  20 C.F.R. § 404.1545(a)(1).  The nature of the limitations is not the focus—the focus is on what work, if any, a claimant can perform after taking into account his limitations.  See Hall v. Astrue, 06-CV-1000, 2009 U.S. Dist. LEXIS 66498, at *23 (E.D.N.Y. July 30, 2009) (citing Beckwithe, 371 F. Supp. 2d at 201; 20 C.F.R. § 416.945(a)(1)).  The finder of fact must consider all of a claimant's impairments in determining the claimant's residual functional capacity.  See 20 C.F.R. §§ 404.1520(e), 404.1545; SSR 96-8p.

The Court finds that the ALJ's assessment of McEachin's residual functional capacity was legally sound and supported by substantial evidence.  That McEachin has an underlying medically determinable impairment—lumbosacral sprain and intervertebral disc displacement without myelopathy—pursuant to 20 C.F.R. sections 404.1529(b) and 404.1545(a)(2), is undisputed, and the ALJ correctly considered it in making his determination.  The ALJ then correctly considered the record as a whole in evaluating the intensity and persistence of

McEachin's symptoms to determine how McEachin's symptoms limited his capacity for work. 20 C.F.R § 404.1529(c)(1); see also 20 C.F.R. §§ 404.1520(e), 404.1545. The ALJ relied upon objective evidence of McEachin's medical impairment, as well as subjective evidence from McEachin himself,[8] given that McEachin's claims that he could not work, lift more than ten pounds, or bend repeatedly were greater than the sum of his symptoms. (See Tr. at 19; see also 20 C.F.R § 404.1529(c)(2)-(3).) The ALJ properly listed the factors to consider in evaluating the evidence of symptoms proffered by McEachin. (See 20 C.F.R § 404.1529(c)(3); Tr. at 18; see also 20 C.F.R § 404.1527.) Having considered the totality of the evidence in the record, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely credible." (Tr. at 19.)

The ALJ based his finding, first, on the treatment prescribed by McEachin's treating physician, Dr. Elie Sarkis, M.D., whom the evidence suggests McEachin last saw on April 26, 2005 and who had prescribed Motrin, Tylenol #3, and physical therapy. (Tr. at 19.) Second, the ALJ based his finding on the results of McEachin's August 8, 2003 MRI, which showed a right paracentral herniation at L2-3, creating a central extradural defect, and a left foraminal herniation at L4-5, creating impingement. (Tr. at 19.) Third, the ALJ also relied upon the consultative examiner Dr. James Liguori's September 8, 2003 lower electromyography studies, which revealed right L3 radiculopathy. (Tr. at 19.) Most prominently, though, the ALJ also based his finding on the evaluations done by Drs. Frank M. Hudak, the workers' compensation consultant, and Kyung Seo, the Social Security consultant, in February and October of 2004, respectively, which "indicate[d] progressive improvement within less than a year after the claimant hurt his

---

[8] The ALJ did not have to take McEachin's subjective evidence as the last word. See, e.g., Hall, 2009 U.S. Dist. LEXIS 66498, at *25 (citing Kendall v. Apfel, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998)). As the regulations make clear, statements about a claimant's pain or other symptoms will not, alone, establish disability—the ALJ must consider objective medical evidence as well. See 20 C.F.R. § 404.1529(a).

16

back at work" and "no recent evidence of any relapse or worsening of symptoms." (Tr. at 19.)
In fact, the ALJ noted that he gave these doctors' opinions "considerable weight." (Tr. at 19.)
The ALJ decided that Dr. Sarkis's indication on McEachin's workers compensation form that
McEachin was "totally disabled from regular duties of work" was not inconsistent with a finding
that McEachin had the residual functional capacity for sedentary work. (Tr. at 19.)

The Court finds that the ALJ's determination with respect to McEachin's residual
functional capacity to be supported by substantial evidence and not to be legally erroneous.
Plaintiff's daily activities, as described during the administrative hearing, (see, e.g., Tr. at 86-91,
324-328), along with evidence that medication relieved his pain, (see Tr. at 94); evidence that he
was making improvements (see, e.g., Tr. at 97, 101); evidence that he was attending vocational
training, (Tr. at 102); evidence that he could take public transportation, (Tr. at 305); and
evidence that conditions aggravating his symptoms could be avoided when performing sedentary
work, (see, e.g., Tr. at 94, 327), together provide adequate support for the the ALJ's
determination. Indeed, McEachin's own testimony demonstrates that he was able-bodied enough
to go about other business, even when viewing his activities only during the restricted period of
July 22, 2003 to May of 2006. (Tr. at 325-328.)

Further, the Court finds that the ALJ's conclusion concerning the kind of sedentary work
that McEachin can perform is not inconsistent with the reports of Drs. Sarkis and Tugetman.
These two treating physicians focused on McEachin's ability to perform his previous work, not
on his ability to perform other types of work (or, for that matter, to ever work again). Simply
put, the statements of Drs. Sarkis, Tugetman, and Lock in McEachin's Workers' Compensation
forms that he was totally disabled were not binding upon the ALJ. See 20 C.F.R. § 404.1504.
After all, New York Workers' Compensation Law and the Act define disability in two different

ways, which only sometimes are mutually inclusive. <u>Compare</u> N.Y. WORKERS' COMPENSATION LAW § 201 (McKinney 1994), <u>with</u> 42 U.S.C. § 423(d)(2)(A). In any event, the ALJ committed no legal error in considering reports that indicated that McEachin was disabled, for purposes of Workers' Compensation, yet still finding that he was not disabled under the Act.

Nor are the findings of Dr. Sarkis, Dr. Tugetman, and Dr. Lock, more significantly, inconsistent with the ALJ's determination of residual functional capacity. This determination is, of course, bolstered by the findings of the physicians who were consulted for McEachin's case. When all is stripped bare, what is left is substantial support in the record for the conclusion that, save undoubted back pain, McEachin is not, and has not been, disabled as defined by the Act. With medication, physical therapy, and a lumbar corset, the record shows that McEachin has been able to go about his life.

The Court also notes that, all else being equal, the opinions of McEachin's treating physicians, Drs. Sarkis, Tugetman, and Lock, are entitled to controlling weight in the ALJ's determination. <u>See</u> 20 C.F.R. § 404.1527(d)(2).[9] At first glance, the ALJ does not appear to have given controlling weight to the opinions of Drs. Sarkis and Tugetman; in fact, he failed to mention Drs. Tugetman and Lock in his decision at all. Meanwhile, the ALJ gave the opinions of Drs. Hudak's and Seo "considerable weight." (Tr. at 19.) Nonetheless, the Court finds that the ALJ's determination as to residual functional capacity is in keeping with 20 C.F.R. section 404.1527(d)(2).

---

[9] The Court does note that the report of McEachin's physical therapist, Julius Varricchio, with respect to McEachin's abilities to sit and walk for extended periods of time, is somewhat at odds with the ALJ's finding. Of course, (1) a physical therapist is not an acceptable medical source, <u>see</u> 20 C.F.R. § 404.1513(a), and (2) Varricchio reported that he could not provide an opinion regarding McEachin's ability to perform work-related activities. (<u>See</u> Tr. at 274.) Beyond that, Varricchio's findings are more inconsistent with the findings of Drs. Sarkis and Tugetman than those of the ALJ.

To begin, the ALJ clearly adopts, whether specifically ascribed to him or not, Dr. Tugetman's findings as to McEachin's impairments (which, again, the ALJ determined were severe). (Tr. at 18-19.) Moreover, the ALJ gave the requisite good reasons for the weight that he gave to Dr. Sarkis's opinion, specifically, that (1) Dr. Sarkis last saw McEachin two years before the administrative hearing and (2) rendered an opinion under the Workers' Compensation Law, not under the Act. See 20 C.F.R. § 404.1527(d). Although the ALJ did not state this in his opinion, the same logic applies to Dr. Lock, who, the record indicates, last saw McEachin over three years before the administrative hearing and who, like Drs. Sarkis and Tugetman, rendered an opinion under the Workers' Compensation Law, not under the Act. That the ALJ gave considerable weight and attention to the opinions of Drs. Hudak and Seo was not reversible legal error, see, e.g., 20 C.F.R. § 404.1527(f)(2), given their substantial support in the record. For example, the opinions of Drs. Hudak and Seo demonstrate that McEachin made "progressive improvement within less than a year after [he] hurt his back at work" with "no recent evidence of any relapse or worsening of symptoms." (Tr. at 19; see also, e.g., Tr. at 226-28, 276-77.) For purposes of determining whether McEachin could ever work again, in any capacity, these opinions are both useful and persuasive. Further, the medical conclusions of Drs. Sarkis, Tugetman, and Lock—that McEachin was totally disabled—are belied both by McEachin's testimony concerning the activities that he could perform following his accident, (see, e.g., Tr. 89-91, 324-35, 327-38; see also id. at 97, 101), and by the findings of Drs. Sarkis and Tugetman in their reports. (See, e.g., 133-36, 140-46, 174-176, 243.) The Court concludes that the ALJ, wisely, gave considerable weight and attention to the opinions of Drs. Hudak and Seo rather than leaning too heavily on those of Drs. Sarkis, Tugetman, and Lock by extrapolating beyond the self-defined limits of their opinions.

At the end of step four, the ALJ found that, although McEachin was not disabled, he was not able to perform any of the work that he had done during the 15 years prior to his application for benefits. See 20 C.F.R. § 404.1565(a). Clearly, the record establishes that McEachin's past jobs all required at least light exertion. See 20 C.F.R. § 404.1567(b). Yet, not inconsistently, the ALJ determined that McEachin could perform "sedentary work." Id. § 404.1567(a). As a result, the ALJ proceeded to step five in his analysis.

2.    McEachin's Ability to Perform Other Work

At this critical juncture, the ALJ found that, considering his age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that McEachin could perform with no or reasonable adjustment. See 20 C.F.R. § 404.1520(g). Accordingly, the ALJ concluded that plaintiff was not disabled, pursuant to 20 C.F.R. §§ 404.1560(c) and 404.1566. (Tr. at 20.) Because McEachin had only exertional limitations—a fact that McEachin does not dispute, (see plaintiff's brief at 5)—the ALJ relied exclusively on the Medical Vocational Guidelines in making his disability determination. He applied Medical-Vocational Rule 201.27 and decided that McEachin was not disabled. (Tr. at 20.)

In the alternative, the ALJ supported his decision upon the opinion testimony of the vocational expert, Pat Green. It was not inappropriate to rely on Green's hearing testimony, which led to the same result, though reliance on the guidelines alone would have been more than sufficient. Heckler v. Campbell, 461 U.S. 458, 461 (1983) ("These [medical-vocational] guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy."); id. at 468 (stating, with respect to step five, that "[t]his type of general factual issue may be resolved as

20

fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing."); cf. Suarez v. Comm'ner of Social Security, No. 06-CV-2868, 2009 U.S. Dist. LEXIS 25228, at *30 (S.D.N.Y. Mar. 26, 2009) (noting that, where a claimant's educational background and other characteristics are captured by the Grid, the ALJ may, but need not, rely exclusively on the Medical Vocational Rules (citing Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004))). Green opined that someone like McEachin would be able to perform the jobs of referral and information aide; information clerk; and reconsignment clerk, jobs with significant numbers of positions available regionally and nationally. (Tr. at 340-341.)

The Court finds that there was substantial evidence to conclude that McEachin could perform sedentary work, of the kinds described by the vocational expert and the guidelines. In fact, as the ALJ found—and as McEachin's non-work activities suggest—McEachin "has the residual functional capacity to perform sedentary work, sitting for a total of six hours in an eight-hour work day, standing/walking for a total of two hours, lifting 5 pounds frequently and up to ten pounds occasionally." (Tr. at 17; see also 61 FR 34478.)

Finally, as the Commissioner notes, McEachin was actually in the 45 to 49 age bracket at the time of the hearing, at the time of the ALJ's decision, and on December 31, 2007, the date on which McEachin was last insured. It is the controlling age classification. See Forbes v. Callahan, No. 97-CV-0215, 1998 U.S. Dist. LEXIS 12279, at *5 (E.D.N.Y. July 15, 1998) (focusing on claimant's age on the date of his hearing); see also Jerome v. Astrue, No. 08-CV-98, 2009 U.S. Dist. LEXIS 104374, at *34-*35, *39-*40 (D.Vt. Nov. 6, 2009) (focusing, for purposes of the Medical Vocational Rules, on claimant's age as at the time of the administrative hearing, at the time of the ALJ's decision, and, "more importantly," on the date claimant was last insured); Suarez, U.S. Dist. LEXIS 25228, at *38 (focusing on claimant's age as of issuance of

the ALJ's decision). This means that the ALJ's application of Medical-Vocational Rule 201.27, which pertains to claimants in the 18 to 44 age bracket, was inappropriate. But this technical error is not significant in light of the fact that, if the ALJ had applied the correct rule, Medical-Vocational §§ 201.21 or 201.22, McEachin would automatically have been found to be not disabled. See Medical-Vocational Rules 201.21-201.22 (using ditto for a "[n]ot disabled" decision). The Court could remand on this point, see Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) ("'When . . . the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.'" (quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)), but, because the outcome would remain the same, and because the Court finds that, disregarding the guidelines entirely, there was substantial evidence to support the ALJ's finding overall, the Court declines to do so.

**CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted, McEachin's cross-motion is denied. The ALJ's decision is affirmed. The Clerk of the Court is directed to enter judgment and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
February 22, 2010

s/ Judge Eric N. Vitaliano

_____
ERIC N. VITALIANO
United States District Judge